Arnold E. Reiter, LLC
75 Montebello Road
Suffern, New York 10901
845-357-2215
areiter@reiterlawfirm.com
*Attorney for Tara Liddle*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------- x

In re:

JEFFREY LEW LIDDLE,
                Debtor.

Case No. 19-10747 (shl)

Adv. Pro. No. 19-01147

-------------------------------------------------------- x

TARA LIDDLE,
                Plaintiff,

    -against-

COUNSEL FINANCIAL II, LLC,

                Defendant.
-------------------------------------------------------- x

**ATTORNEY AFFIRMATION IN REPLY TO DEFENDANT COUNSEL FINANCIAL II, LLC'S MEMORANDUM OF LAW AND AFFIDAVIT IN OPPOSITION TO PLAINTIFF TARA LIDDLE'S REQUEST FOR AN ORDER DIRECTING TURNOVER OF FUNDS**

Arnold E. Reiter, an Attorney admitted to practice before the Courts of the States of New York, New Jersey, District of Columbia and Arizona, by way of reply to Defendant's, Counsel Financial II, LLC's, ("CF II"), Memorandum of Law, as well as Affidavit of one Michael Wexelbaum, hereby states as follows:

**PRELIMINARY STATEMENT**

Tara Liddle's (the "Plaintiff") fifty percent (50%) interest in the Sale Proceeds of the Cooperative Apartment she jointly owned with her husband, Jeffrey L. Liddle (the "Debtor"), as tenants by the entirety, has been wrongfully withheld by CF II for nearly six months. First, CF II obtained a TRO and an Order of Attachment against the Sale Proceeds in a New York Supreme Court,

Erie County, an action to which Tara Liddle was neither a party nor served with any process. Second, CF II objected to the Debtor's Turnover Motion (**ECF 14**) filed on March 23, 2019 seeking an order directing the Escrow Agent to pay Tara Liddle her interest on the ground that her interest was Cash Collateral in the Chapter 11 case, despite the fact that Tara- Liddle was not a debtor in this case nor had been served with any process, and that her interest was not property of the estate. Throughout this case, CF II has asserted a secured interest in Tara Liddle's property as Cash Collateral without any showing of privity with Tara Liddle, any written instrument granting or transferring her real property interest to them, or any signed document conferring to the Debtor, or anyone else, a power of attorney or other authority to dispose of her interest in the Sale Proceeds. She has been deprived of her property without due process.

Now, six months into this gross miscarriage of justice, and despite many Court hearings, multiple depositions and voluminous document productions, CF II is continuing to argue that Tara Liddle's money should be withheld and that it should control the disposition of her interest in the Sale Proceeds despite the fact that CF II has not produced a shred of evidence contradicting the undisputed facts that:

1) Tara Liddle owned a fifty percent (50%) interest in the Sale Proceeds;
2) CF II had full knowledge since 2016 of this interest, (see attached correspondence and financial statement as <u>Exhibit "A"</u>);
3) No writing (as required by New York law) exists transferring that interest to CF II, or any other party;
4) No contractual privity exists between Tara Liddle and CF II;

5) There is no written evidence or oral testimony that Tara Liddle granted power of attorney, authorized her husband, or otherwise consented to the disposition of the Sale Proceeds in favor of CF II, (see Tara Liddle deposition testimony excerpts below); and

6) That no security agreement was entered into between CF II and Tara Liddle, let alone perfected against her.

Rather, what the record reflects is that Tara Liddle has been deprived of her property, denied any semblance of due process, and suffered significant harm to her good name, credit, and property. This is because CF II has used her as a pawn in its "scorched earth" collection practices against her husband.

This must stop.

## THRESHOLD PROCEDURAL RESPONSE

1. CF II expends considerable time and energy in enumerating and attaching various term sheets and promissory notes from entities other than the Defendant, CF II. The only reference to a Note between the Debtor and CF II is in Exhibit "J" of Mr. Wexelbaum's Affidavit, (Revolving Promissory Note dated August 5, 2016 with three Allonges made by L&R as Borrower and guaranteed by Jeffrey Liddle (And others), in the amount of $5,600,000. This is the subject matter of this litigation and the judgment procured by CF II in the State Court Erie County matter. Therefore, the only Note and/or Term Sheet in question is the one between CF II and L&R and the Debtor/Guarantor.

2. CF II expends considerable energy on defining the word "collateral." Wherein the language seems to declare that CF II had mortgage interests on all real estate owned by the guarantors, included, but not limited to "111 Fifth Avenue" (An apparent typographical error, CF II insists that it means 11 Fifth Avenue, Apartments 19M and 19N), no such "mortgages existed. In fact, there is no such concept in law as a mortgage interest on Cooperative Apartments. It is a secured interest if properly perfected. However, it has been demonstrated that CF II <u>did not take the appropriate steps to</u>

3

<u>perfect a security interest in the Cooperative Apartments, and certainly has never had a secured or any interest in Tara Liddle's funds.</u>

3.  Tara Liddle does not argue that the Cooperative Apartment proceeds held in escrow belonging to the Debtor (50%) are subject to some form of claim. Rather, Tara Liddle has presented and reaffirms that CF II, and any of its affiliates, had complete advance knowledge of the ownership of the Cooperative Apartments and knew exactly what Jeffrey Liddle had authority to pledge and/or assign. To establish or attempt to establish that Tara Liddle either knew or should have known or should be estopped or somehow waived her right to the Cooperative Apartments proceeds is frivolous and subject to Rule 11 Sanctions.

4.  It is dipositive of this matter that the Debtor communicated in 2016 the value of the Cooperative Apartments and the form of ownership, both on a financial statement, as well as by way of stock certificates. Indeed, if CF II intended to secure Tara Liddle's proceeds in the apartments, at the time it should have insisted that Tara Liddle sign a personal guaranty or some form of pledge of the Cooperative Apartment proceeds. As a condition of the loan, CF II did require that the Debtor have the Debtor's spouse, Tara Liddle, execute an assignment of insurance proceeds in the event of the death of the Debtor. If CF II intended that Tara Liddle relinquish her proceeds to the Cooperative Apartments at the sale of the Cooperative Apartments, then CF II would have and should have insisted on an assignment of proceeds. It did not. Tara Liddle should not be penalized/damaged for CF II'S inaction or negligence in not having Tara Liddle execute a personal guaranty or an assignment of proceeds as the joint owner of the subject Cooperative Apartments.

## ADDRESSING THE CONDITIONS OF INJUNCTIVE RELIEF

1.  Plaintiff, Tara Liddle, addressed in her original Motion the components supporting injunctive relief satisfactorily. CF II has responded frivolously. As a pure threshold question, how could Tara Liddle not suffer irreparable harm when the only money she had at her disposal to pay off

4

substantial debt has been withheld from her and held hostage? Indeed, Tara Liddle cannot have a dental appointment because monies owed to her dentist preclude the dentist from seeing her at this time; she cannot retrieve clothing from a clothing store because of funds owed to that store; she owes substantial debt to a credit card that she has not been able to pay and as a result her credit is ruined; she has not been able to pay her counsel anything since the inception of this matter because of the freeze of her monies. She owes the Internal Revenue Service taxes that she has not been able to pay. It is Tara Liddle's position and that of the Undersigned that CF II, by its attorney's own admission, is using every "trick in the book" to prevent her from receiving these funds to squeeze her into her own personal bankruptcy, (or until she succumbs and agrees to turnover some monies in the form of a settlement).

2.      The other elements of the injunctive relief are a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation and balance of hardships tipping decidedly toward the party requesting the relief. CF II has not one document nor one scintilla of evidence indicating Tara Liddle's acquiescence, waiver or outright assignment of the Cooperative Apartment proceeds to CF II or any of CF II's affiliates. As such, there is clearly a likelihood of success on the merits on behalf of Tara Liddle to have these proceeds released. CF II's arguments simply fail.

3.      There is a "*Through the Looking Glass*" quality to CF II's argument that Tara Liddle does not meet the standards for injunctive relief. CF II complains that Tara Liddle will use the money to pay personal expenses so that when it obtains a judgment it will not receive the proceeds. But, obviously, it is CF II that is asking the Court to sustain its *de facto* preliminary injunction pursuant to which it has attached Tara Liddle's asset without any due process. CF II has had the benefit of a pre-judgment attachment for six months.

5

## IN THE MATTER OF THE PERFECTED SECURITY INTEREST AND THE COURT'S POSITION THERETO

In "Reply Memorandum in Further Support of Its Perfected Security Interest in and Lien Upon Cash Collateral" (**ECF 95**) (the "Reply Memo."), CF II declared that it "is not claiming it had a security interest or lien pursuant to the Order of Attachment." (Reply Memo. at p. 1.) CF II's concession is fatal to its claim of a security interest in Tara Liddle's share of the Sale Proceeds. As CF II said in its "Response to Debtor's Motion for Turnover" (**ECF 23**) (the "Response"), "Importantly… the order of attachment permitted CF II to attach all of the Funds, despite a claim by the Debtor's wife that she was entitled to 50% of the money." (Response at ¶6.) CF II had recognized that the only basis for a secured claim against Tara Liddle was the Order of Attachment.

CF II's reversal of its position and its exclusive reliance on the 2017 CF II Security Agreement with the Debtor which allegedly created an interest in the Debtor's "money" perfected by the Escrow Stipulation provides no avenue for relief against Tara Liddle. She was not a party to the 2017 CF II Security Agreement which purportedly created the security interest in the "money." There was no "interest" of Tara Liddle's property to be perfected through the Escrow Stipulation. Thus, this sole asserted basis for CF II's claim has no force against Tara Liddle. The futility of CF II's position was further confirmed by this Court's June 24, 2019 apparent Bench ruling that there was no perfected security interest against any of the Sale Proceeds.

CF II's continual refrain, repeated in the Reply Memo., was that Tara Liddle was invited to intervene in the Erie County Action to reclaim her interest in the Sale Proceeds. This position turns the Fifth Amendment on its head. It requires an unserved non-party to appear in Court hundreds of miles away to explain why she should be allowed to retain her property. Our basic notions of fair play demand due process before deprivation of property, not after.

6

And all the while, CF II was fully aware of Tara Liddle's interest. In their Initial Response, they attach as Exhibit H the Personal Financial Statement that Jeffrey Liddle had delivered to them in March 28, 2018, which shows the ownership of 11 Fifth Avenue as held by "JLL & TJL." It is in the papers they filed on their Motion for an Order of Attachment in Erie County and in their initial reply here.– In addition, in 2016 (<u>Exhibit "A"</u> herein), Jeffrey Liddle delivered a Personal Financial Statement showing the Apartments owned jointly.

The Debtor and CF II have engaged in its own motion practice concerning whether or not CF II has a perfected security interest in the Debtor's proceeds from the sale of the Cooperative Apartments. As set forth previously, the Court has determined that CF II does not have a perfected security interest in any of the Sale Proceeds. If that claim fails, so must the secured claim against property that was not even part of the Bankruptcy Estate.

The Debtor, in a Brief submitted previously to this Court addressing the matter of a perfected security interest noted:

> *"CFII's claim to a perfected security interest in the NY Coop is fatally flawed from inception. To begin with, CFII never had a security interest in the NY Coop. The June 2, 2017 loan on which CFII bases its claim, see Doc. 74 at 4-5, was a loan made by CF Holdings, not CFII. The lender, CF Holdings, was not a party in the Erie County Action, was not a party to the Escrow Stipulation, and has not appeared in the Chapter 11 Case. CFII's attempt to mask this fatal defect under a mountain of irrelevant loan documents, UCC filings, security agreements, and so forth— all wholly unrelated to the question asked by the Court—is characteristic of CFII's conduct throughout this case and indeed CFII's entire relationship with the Debtor and the Debtor's law firm.[4] But it cannot overcome this simple fact: CFII was not the secured party with respect to the loan made on June 2, 2017."*

## THE ALLEGATION OF A FRAUD PERPETUATED BY THE DEBTOR

In desperation, CF II has raised a notion that the Debtor, Jeffrey Liddle, allegedly committed a fraud by assigning the sale proceeds of the Cooperative Apartments, since Tara owned half of the apartments.

7

As previously submitted and attached again herein, the Debtor, Jeffrey Liddle, in 2016 provided financial statements and the Cooperative stock certificates showing the joint form of ownership up front. Therefore, CF II (or any of its entities), had complete and full knowledge of the nature of ownership of the Cooperative and what Jeffrey Liddle could assign or not.

In New York, the elements to establish fraud are:- a) The making of a statement; b) The falsity of a statement; c) An intent to deceive, sometimes called "scienter"; d) Reasonable reliance on a statement by the affected party; and e) Injury sustained as a result of the reliance.

The Debtor fully disclosed and CF II had the benefit of the disclosure of all of the facts and circumstances surrounding the making of the various promissory notes between the Debtor and CF II and its other entities. As a matter of law, there cannot be a fraud claim when CF II had complete knowledge of the nature of ownership of the Cooperative Apartments.- This attempt by CF II is a diversionary tactic and smokescreen without any substance or sense of reality.

### THE WEXELBAUM AFFIDAVIT AND THE CLAIM OF INCOMPLETE PRODUCTION

As presented previously by the Undersigned, noted, previously, CF II's "MO" in this entire matter has been one of processing delay. CF II'S frivolous actions have cost Tara Liddle substantial legal fees and costs and left her credit in ruins. Indeed, CF II's counsel, Larry Hutcher, in conversation with the Undersigned has disclosed that as a negotiating tactic. Counsel Wexelbaum's declaration that discovery was insufficient and did not follow his predetermined criteria is nonsensical, frivolous and without merit. Tara Liddle was instructed by the Undersigned to deliver any and all documentation, emails, texts and the like, concerning Apartments 19M and 19N at 11 Fifth Avenue as between herself and the Debtor. Tara Liddle did what she was told and delivered said documentation. There is nothing more. A review of excerpts of Tara Liddle's deposition is instructive here.

## **THE TARA LIDDLE DEPOSITION**

1.  Per the Scheduling Order of this Court, including the notion of holding a deposition of Tara Liddle for the express purpose of examining her interests in the escrow proceeds and her participation in the sale of the apartments, on Friday, June 14, 2019, Tara Liddle was deposed by Michael Wexelbaum of the firm of Davidoff Hutcher & Citron LLP at 605 Third Avenue, 34th Floor, New York, New York.

    a)    As to Tara Liddle's knowledge of CF and the Liddle & Robinson borrowing - (Pg. 24, Lines 6 through 19):

> "Q    Did he tell you that the law firm had borrowed millions of dollars from Counsel Financial?
> A    No.
> Q    Did you ask him how much the law firm owed to Counsel Financial?
> A    No.
> Q    Have you heard of Counsel Financial Services, LLC?
> A    I have now.
> Q    When did you first hear of that entity?
> A    Basically at the closing of my apartment."

(Pg. 32, Lines 19 through 25):

> "Q    To the best of your recollection, what did he say to you and what did you say to him about those loans?
> A    Well, I wouldn't have said anything because that's his business, and if he felt he needed money for his law firm, he would do what he had to do. That's not my business."

    b)    As to Tara Liddle assigning, acquiescing or somehow agreeing to have her share of the Cooperative Apartments being used as collateral for the loan - (Pg. 36, Lines 11 through 14):

> "Q    He never mentioned to you that your assets or property were needed as collateral security for the loans?
> A    No."

(Pg. 38, Lines 9 through 14):

> "Q    Did you ever agree with Mr. Liddle that you would put up any of your own property or assets in order to secure the loans being made to Liddle & Robinson by the Counsel Financial entities?
> A    No."

9

(Pg. 38, Line 22 through 25 and Page 39, Line 2 through 5):

"Q     Did you ever agree with Mr. Liddle that you would surrender, give up - - surrender or subordinate, which means put behind someone else, any of your rights or interest in or to any property or assets in order to provide Counsel Financial with some security for the loans it was making?
A     No."

(Pg. 56, Lines 14 through 19):

"Q     Did you ever consent to Mr. Liddle using mortgages on the apartment in New York City to reduce the loan balance of Liddle & Robinson to Counsel Financial?
A     No."

(Pg. 70, Line 21 through 25, Pg. 71, Line 2 through 12):

"Q     Did Mr. Liddle ever discuss with you any such refinancing?
A     Not that I recall.
Q     Would you have agreed to any such refinancing?
A     No.
Q     Why not?
A     Because I owned half of the apartment.
Q     And if Mr. Liddle told you that he needed it to help the law firm of Liddle & Robinson survive economically, you would not have agreed to that?
A     My half?
Q     Yes.
A     No."

(Pg. 91, Lines 2 through 25, Pg. 92, Lines 2 through 4):

"Q     Did you ever sign any document of any sort, anything, pledging proceeds from that co-op apartment to Counsel Financial or any one of the its entities that Michael talked about today?
A     No.
Q     Did you ever assign, pledge, consent, say to Jeff you can have my proceeds as a part of - - in terms of paying back Counsel Financial - -
A     No.
Q     - - or its entities?
A     No, I did not.
Q     Did you ever in writing or verbally or any way tell Jeff that you were waiving your right to the sale proceeds of the co-op to assist him?
A     No, I did not.
Q     Or assist Liddle & Robinson?

> *A   No, I did not.*
> *Q   Were you ever approached by anybody to assign or waive your interest in the apartments to satisfy this debt?*
> *A   No, I was not.*
> *Q   Did you ever sign a guarantee or any sort of document in favor of Counsel Financial or any one of its other entities?*
> *A   No."*

c) <u>As to Tara Liddle's execution of a life insurance assignment –</u>
<u>(Pg. 54, Lines 24 through 25, Pg. 55, Lines 2 through 11):</u>

> *"Q   When you signed this, did you ask him what you were giving up by signing this consent and acknowledgment?*
> *A   I didn't ask.*
> *Q   And he didn't tell you?*
> *A   He explained it.*
> *Q   What did he explain to you?*
> *A   That as far as I can recall, that this would be - - if he owed money, this - - whatever he - - if he died and he owed money, the amount of money he owed would be paid off first and then I would get the remainder."*

d) <u>On the adequacy of production of documents –</u>
<u>(Pg. 88, Line 15 through 25):</u>

> *"Q   Did you search all emails between you and Jeff, your husband, pertaining to the apartments 19M and 19N for production of documents for this deposition?*
> *A   Yes."*

e) <u>On the notion of Tara Liddle participating in the Erie County litigation –</u>
<u>(Pg. 97, Lines 17 through 22):</u>

> *"Q   Were you ever served, you personally served, with any papers saying something like a summons or complaint or official court paper in the action - - in the Erie County action that Mr. Wexelbaum referred to?*
> *A   No."*

## THE JEFFREY LEW LIDDLE DEPOSITION

On June 24, 2019 Attorney Wexelbaum, on behalf of CF II deposed the Debtor, Jeffrey Lew Liddle.— The following provisions of the deposition testimony make it abundantly clear that Tara Liddle had no involvement whatsoever in the borrowing obligations of Liddle & Robinson and Jeffrey

11

Lew Liddle.- Her only participation was to assign life insurance proceeds in the event of the death of the Debtor.

    a)    On the matter of Tara Liddle assigning her property for the loans -
-(Pg. 44, Lines 24 and 25, Pg. 45, Lines 2 through 21):

"Q    Okay. Did you ever discuss with your wife, Tara Liddle, her putting up any of her own property or assets as collateral for a loan or loans to Liddle & Robinson by any one or more of the Counsel Financial entities?
A    I have discussed that topic, yes.
Q    When did you have those discussions with Mrs. Liddle?
A    Most of them have been recently.
Q    Define "recently," please.
A    Since - - I would say since September of 2018.
Q    Not before that?
A    I had said most of them.- I have discussed the topic over the years and - - with her.
Q    And tell me what those discussions were about.
A    I told her that her property was not the subject of any of the loans or the guarantees for any of the banks that we ever did business with as a firm."

(Pg. 45, Lines 23 through 25, Pg. 46, Lines 2 through 7):

"Q    Would your answer be the same if I asked you whether you ever discussed with Tara Liddle her putting up any of her own property or assets as security for any of the loans in question?
A    To the degree that there has been a discussion where I have been asked about that, the answer is absolutely not.- Never in a million years did I offer or ask her to offer to put up any of her property with regard to the firm."

(Pg. 46, Lines 13 through 20):

"Q    Did you ever discuss with Tara Liddle her surrendering or subordinating any of her rights or interests in or to any property assets in order to provide Counsel Financial with collateral or security or collateral security for any of the loans made to Liddle & Robinson?
A    I would say the answer to that is no."

## **CONCLUSION**

In reply to CF II's Memorandum of Law and Affidavit by Mr. Wexelbaum, it is clear that CF II is attempting to delay these proceedings again in any manner possible and to prevent Tara Liddle from receiving her funds. CF II does not have a security interest in Tara Liddle's portion of the escrow. CF II has not delivered one document, despite the Court's mandate on same that evidences a bona fide claim against Tara Liddle's money. CF II's actions have been frivolous and are subject to Rule 11 sanctions. Therefore, the Court must decide in favor of Tara Liddle and release these proceeds once and for all.

Respectfully,

Dated: August 2, 2019

_____
Arnold E. Reiter, Esq.

# Exhibit "A"

**Karen Hetz**

**From:** Karen Hetz
**Sent:** Tuesday, July 26, 2016 10:18 AM
**To:** kanthony@counselfin.com; jkasouf@counselfin.com
**Subject:** Liddle & Robinson LLP – Jeffrey L. Liddle's documents
**Attachments:** JLL – Attorney Financial Statement – signed 7-25-16.pdf; JLL Credit Authorization.pdf; Jeffrey L. Liddle – NYS Driver License.pdf; Jeffrey L. Liddle – 2013.pdf; Jeffrey L. Liddle – 2014 – 1 of 2.pdf; Jeffrey L. Liddle – 2014 – 2 of 2.pdf; Jeffrey L. Liddle – 2015.pdf

Attached are the following documents for Jeffrey L. Liddle:

Attorney Financial Statement;
Credit Authorization;
NYS Driver License;
2013 – 2015 Tax Returns

Karen Hetz
Controller
Liddle & Robinson, L.L.P.
800 Third Avenue, 8th Floor
New York, NY 10022
(212) 687-8500, ext. 226
khetz@liddlerobinson.com

1



**Counsel Financial**
The power of attorney funding.

**Confidential**
**Attorney Financial Statement**
page 1 of 2

Partner name: JEFFREY L. LIDDLE

Home address (number, street, city or town, state, ZIP code): 41 FIFTH AVENUE, NEW YORK, NY, 10003    Apt. 19M

Date of birth: APRIL 21, 1949    Social Security Number: 338 44 8258

| ASSETS | AMOUNT | LIABILITIES | AMOUNT |
|---|---|---|---|
| Cash, Savings, CDs | 20,000 | Notes Payable (Schedule D) | -0- |
| Marketable Securities (Schedule A) | -0- | Secured | -0- |
| Retirement Plans | 700,000 | Unsecured | -0- |
| Notes Receivable | -0- | Credit Card Balances | 60,000 |
| Cash Value of Life Insurance (Schedule B) | -0- | Taxes Payable | 1,300,000 |
| Vehicles (year, make, model) | | Life Insurance Policy Loans | -0- |
| 2009 Porsche 4S Cabrio | 50,000 | Mortgages | |
| 2008 Jeep Cherokee | 10,000 | Homestead | 1,650,000 |
| 1970 MG-B | 25,000 | Other | 2,650,000 |
| | | Second Mortgage (HELOC) | 1,820,000 |
| Real Estate (Schedule C) | | Contingent Liabilities (Schedule E) | |
| Homestead | 8,500,000 | | |
| Other | 6,800,000 | Other Liabilities (please detail) | |
| Other Assets (please detail) | | | |
| Lawsuit re: Apartment damage | 100,000 | | |
| Furniture & Fixtures | 150,000 | | |
| Misc. | 75,000 | | |
| | | Total Liabilities | 7,480,000 |
| | | Net Worth (assets less liabilities) | |
| Total Assets | 16,725,000 | Total Liabilities & Net Worth | 8,965,000 |

**Schedule A**                                                                **Stocks & Bonds**

| NAME OF ISSUE AND TYPE OF SECURITY | WHERE TRADED | TOTAL VALUE | PLEDGED | REGISTERED IN NAME OF |
|---|---|---|---|---|
| | | | ○ No ○ Yes | |
| | | | ○ No ○ Yes | |
| | | | ○ No ○ Yes | |

**Schedule B**                                                                **Cash Value of Life Insurance**

| COMPANY | POLICY # | FACE AMT. | CASH VALUE | POLICY LOANS | PLEDGED | BENEFICIARY |
|---|---|---|---|---|---|---|
| | | | | | ○ No ○ Yes | |
| | | | | | ○ No ○ Yes | |
| | | | | | ○ No ○ Yes | |

(continued on next page)

Counsel Financial • 6400 Main Street, Suite 120 • Williamsville, NY 14221 • Toll-Free 1-800-820-4430 • Fax (716) 568-0266 • AttorneyLending.com

9



**Counsel Financial**
The power of attorney funding.

③
**Confidential**
**Attorney Financial Statement**
page 2 of 2

**Schedule C** — Real Estate

| LOCATION | PRESENT VALUE | MONTHLY INCOME* | NAME ON TITLE | CREDITOR | OUTSTANDING BALANCE |
|---|---|---|---|---|---|
| 11 FIFTH AVE (NYC) | 8,500,000 | N/A | JLL + TJL | | 1,650,000 |
| 560 MAIN ST QUIOGUE | 6,800,000 | N/A | JLL | | 2,650,000 |
| 554 MAIN ST " | 800,000 | N/A | JLL | N/A | — |

*if applicable

**Schedule D** — Notes Payable

| LENDER | ORIGINAL AMOUNT | PRESENT BALANCE | MATURITY | INTEREST RATE | COLLATERAL |
|---|---|---|---|---|---|
| SIGNATURE * | 1,800,000 | 1,800,000 | APR, 2017 | 4% | APT 19H, NYC (11 FIFTH) |

*This is a HELOC

**Schedule E** — Contingent Liabilities

| OTHER COMPANIES YOU HAVE AN EQUITY INTEREST IN | CURRENT INDEBTEDNESS OF ENTITY |
|---|---|
| | |
| | |
| | |

Do you currently, or have you ever had: (if yes, please explain)

Judgment(s)    ☒ No  ☐ Yes
Tax liens    ☐ No  ☒ Yes  PENDING
Pending lawsuits    ☐ No  ☒ Yes  SUING RE: FLOOD IN MY 19TH FLOOR APT.
Bankruptcy    ☒ No  ☐ Yes
Other liens    ☒ No  ☐ Yes
Alimony / child support /
property settlement obligations    ☒ No  ☐ Yes

Please list the jurisdictions in which you are licensed to practice: New York, D.C., various Federal District + Cir Courts

SIGN HERE ) [signature]    Date: July 25, 2016
Name of applicant (please print): JEFFREY L. LIDDLE

*Please complete one copy of this form for each partner.*

Counsel Financial • 6400 Main Street, Suite 120 • Williamsville, NY 14221 • Toll Free 1-800-820-4430 • Fax (716) 568-0266 • AttorneyLending.com